THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* WILLIAM L. BOWERS, Appellant.

Fourth Department, July 5, 1974.

*Richard C. Mitchell, Jr.*, for appellant.

*Eugene F. Sullivan, Jr., District Attorney*, for respondent.

WITMER, J. Defendant appeals from the judgment of Oswego County Court convicting him on his plea of guilty of murder (Penal Law, § 125.25, subd. 3) and burglary in the third degree (Penal Law, § 140.20) in full satisfaction of an eight-count indictment and sentencing him to an indeterminate term of imprisonment for a minimum of 19 years and a maximum of life on the murder plea and unconditionally discharging him with respect to the burglary plea. The grounds of the appeal are two, to wit, (1) that the court abused its discretion at the time of sentencing when defendant requested leave to withdraw his guilty pleas, in that the court refused to conduct a full hearing thereon and failed to assign new counsel to him with respect to his application, and (2) the court erred in denying defendant's motion to suppress his oral and written statements to the police after his arrest.

Defendant was indicted with two others for entering the home of one Phelps and beating and stabbing him in the course of a

forcible larceny of property from his home, as the result of which he died. In response to defendant's request for counsel the court assigned two attorneys to defend him on the indictment. After a *Huntley* hearing the court denied defendant's motion for suppression of his statements to the police. On September 28, 1972 defendant offered, through his assigned counsel, to withdraw his previous plea of not guilty and to plead guilty to the third count of the indictment and with respect to the sixth count (burglary, first degree) to plead guilty to the reduced charge of burglary in the third degree, in full satisfaction of the indictment. The District Attorney agreed to accept such pleas and the court questioned defendant at length concerning them. In response to such questions defendant stated that he changed his plea of his own free will, that no promise had been made to him to cause him to change his plea, that no force or threat had been made against him to induce his change of plea, that he had conferred with and been advised by his assigned counsel with whom he was satisfied, and that he was guilty of the third count, i.e., murder, and of the sixth count of burglary as reduced to the third degree. The court did not question defendant about the facts of the crimes to which he pled, but accepted the pleas and set October 31 as the date for sentencing.

On appearing for sentence on that date defendant's counsel advised the court that defendant wished to withdraw his guilty pleas on the principal ground that he made them under a misapprehension of the facts; that defendant now felt that all of his rights had not been explained to him by his counsel; that they had applied duress on him to induce his change of plea, which he did not really wish to make; that in fact he was innocent of the charges in the indictment and wished to withdraw his pleas of guilty and stand trial. Defendant's attorneys requested that the court assign new counsel to defendant and conduct a hearing on his application to withdraw his guilty pleas.

The court then further interrogated counsel and defendant. Defendant stated that neither of his counsel had prior experience with criminal cases and that he was not satisfied with them for that reason at the time he changed his plea and was still not happy with them. He admitted that he had stated the contrary to the court when he made his change of plea and that although he then made such statement knowingly, he had not really wanted to change his plea but wanted to stand trial, and he did not believe that he was guilty of the charges. In response to the court's question defendant stated that the fact that the indict-

ment had been dismissed as against one of his codefendants since his change of plea had nothing to do with his desire to withdraw it. The People did not claim that they would be prejudiced by reinstatement of defendant's not guilty plea, but they urged that defendant knowingly and intelligently changed his plea to guilty and should be held to it.

Subdivision 4 of CPL 220.60 provides that, " At any time before the imposition of sentence, the court in its discretion may permit a defendant who has entered a plea of guilty to the entire indictment or to part of the indictment to withdraw such plea, and in such event the entire indictment, as it existed at the time of the plea of guilty, is restored."

In *People* v. *McKennion* (27 N Y 2d 671, 673) the court held that where, after a plea of guilty and before sentencing, a defendant states that he is not guilty and wishes to withdraw his guilty plea, " the rule has developed that the court should not, except in extraordinary circumstances, then impose sentence, but either grant an application to allow the plea to be withdrawn; or conduct a hearing to determine whether the application has merit ". In *People* v. *Dixon* (29 N Y 2d 55) the court distinguished the case from *McKennion* on its facts. The court adhered to *McKennion* in *People* v. *Flowers* (30 N Y 2d 315) and in *People* v. *McClain* (32 N Y 2d 697). In a *Per Curiam* opinion in *McClain* the court set forth what appears to be the dimensions of the rule in applications of this nature, stating, " In each case the defendant on sentencing asserted his innocence of the crime to which he had only a short time before pleaded guilty. Under these circumstances, namely, where prompt application is made, ' the court should be quick to offer the defendant an opportunity to withdraw his plea and at the very least conduct a hearing. Such opportunities offered will squelch the faker and protect the truly misguided ones '. (*People* v. *Nixon,* 21 N Y 2d 338, at p. 355.) The courts in each of these cases should have at least held a hearing on the motion to withdraw the plea, on the basis of which to make an informed determination in accordance with the principles laid down in *Nixon*. Although usually necessary in the normal case we do not say a hearing is always necessary. (Cf. *People* v. *Allen,* 32 N Y 2d 693 [also decided today]; *People* v. *Dixon,* 29 N Y 2d 55.)"

In upholding the denial of a hearing in *People* v. *Garrett* (43 A D 2d 503) we found that the sentencing court had in substance complied with the requirements of *McClain*. The case is consonant with *People* v. *Dixon* (*supra*). The instant case differs

from *Garrett* because here the defendant asserts that his pleas were induced by duress on the part of his counsel and because of his request that new counsel be assigned to represent him on a hearing on his application to withdraw his pleas. Where a defendant makes assertions against his counsel, it is not reasonable to expect that such counsel can or will effectively represent him in advancing his charges against their conduct. Failure to assign new counsel in such circumstances amounts to deprivation of effective assistance of counsel to the defendant (see *People* v. *Rozzell*, 20 N Y 2d 712).

Defendant having made prompt application for withdrawal of his guilty plea on such grounds, and no claim of prejudice having been made by the People, the court abused its discretion in denying the application without assigning new counsel to defendant and conducting a hearing thereon.

We turn to the order of the court denying defendant's motion to suppress his oral and written statements to the police.

The crime was committed in Oswego County on May 4, 1972. On May 20, 1972 at 10:00 P.M. defendant was arrested and taken to the Syracuse Police Department. At 4:00 A.M. on May 21 he was taken to an interview room where, according to the police, his constitutional rights with respect to talking to the police were read to him and he replied that he knew them. Defendant testified that he thought that he had been arrested with respect to a stolen automobile, and that when the police told him that they wanted to talk with him about a murder, he said that he wanted an attorney and would not talk with them until he had seen an attorney. He said that he had a friend whose brother was an attorney, and he asked them to get his friend so that he could arrange to have that attorney represent him. Instead, the police called the District Attorney and when he arrived defendant made the same request of him. At about 4:15 A.M. the District Attorney telephoned not to defendant's friend but to the attorney, who stated that he did not know the defendant, and the District Attorney reported that to the defendant. The police testified that they did not then question the defendant, but defendant denies that.

Defendant was then taken to a police substation and fingerprinted and photographed, and he was arraigned before a Town Justice at 6:00 A.M. Defendant informed the Justice that he was attempting to retain counsel. He was then taken to the Oswego County Jail.

The next day, May 22, at 10:00 A.M. the police officer visited defendant to take his palm prints, after which he asked defen-

dant if he wanted to talk about the murder incident, to which defendant answered, "No". According to the officer, however, defendant indicated that he would talk with him that afternoon. The officer returned at 3:30 P.M., but defendant said that he would not talk about the matter.

The following day, May 23 at 2:00 P.M. that officer and a State Police officer returned to the jail and had defendant brought to them for an interview, and they testified that they read his "rights" to him and that he said that he knew his rights and did not want an attorney and would talk with them. They told him that they had talked with his codefendants and had statements from them, that the police had enough on defendant to "nail" him for murder, and they suggested that he should tell them his version of the incident to make it easier for himself. Defendant then told them of how he and his codefendants planned to break into Phelps' home and steal rare guns and knives for resale, that after they broke in, a codefendant hit Phelps on the head with a brick, and while the codefendants were searching for the weapons, defendant stayed with Phelps, keeping him out of the way and finally stabbing him to keep him quiet. On leaving they also took Phelps' wallet. This oral statement was then reduced to writing and read to and by defendant who corrected it and then signed it.

Defendant testified that when the officers returned to the jail and had him brought to them for an interview on May 23, he told them that he did not want to talk with them and wanted to talk with an attorney; and his rights were not read to him. He said that the officers told him that everybody was "pushing things over on" him and that he should give them his version of the incident to help them get more on his codefendants; and defendant then gave his statements. He testified that after his oral statement was given and after three quarters of the written statement was prepared, one of the officers read his "rights" to him. He admitted, however, that in fact he knew his rights, except that he did not know that he had a right to stop talking whenever he wanted to and was entitled to have an attorney present during the interview by the officers, which information was not told to him. A police report indicated that defendant said that he did not have an attorney and wanted to have one present, but an officer testified that the report was inaccurate.

The record also shows that on May 21 defendant tried to telephone to his friend whose brother was an attorney, but he was unable to reach him. On May 22 he tried to telephone

to his fiancée to ask her to get him an attorney, but he could not reach her, and he also tried unsuccessfully to call his mother. He left messages for his friend and his fiancée to contact him. Only after he had given the statements on May 23 did his friend finally come and defendant was able to talk with him. On this evidence the court ruled that defendant's statements were voluntary and admissible.

In *Miranda* v. *Arizona* (384 U. S. 436, 473–474) the Supreme Court held that " Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." " The avowed purpose of the *Miranda* rules is to restrict ' custodial interrogation ' which the Supreme Court found to be inherently coercive " (*People* v. *Kaye*, 25 N Y 2d 139, 143). The right of an accused to counsel at this stage as a procedural safeguard enjoys equal standing with the privilege against self incrimination (*People* v. *Donovan*, 13 N Y 2d 148; and, see, *People* v. *Arthur*, 22 N Y 2d 325; *People* v. *Taylor*, 16 N Y 2d 1038; and cf. *People* v. *Brundigé*, 43 A D 2d 1009).

In view of *Miranda*, the police were legally foreclosed from interrogating defendant once he insisted upon asserting his right to remain silent and to have counsel present. We recognize that there is a clear distinction between an interrogation foreclosed as stated in *Miranda*, and a statement made after " a subsequent request, upon reiteration of the requisite warnings, for reconsideration of an earlier decision to make no statement " (*People* v. *Gary*, 31 N Y 2d 68, 70). However, what is prohibited is a subsequent request made, " in the course of continued importunity or coercive interrogation in the guise of a request for reconsideration " (*ibid.*). This is precisely what occurred in the instant case.

From the moment he learned that he was a target of the Phelps investigation, defendant insisted upon his right to remain silent and have counsel present. Throughout 2½ days of confinement without an attorney, he persisted in adhering to his rights. Still, neither the police nor the District Attorney made any serious effort to help him obtain an attorney. During this period he himself attempted, unsuccessfully, to obtain counsel. Even by the People's version of the facts, defendant confessed

only upon being confronted with the case against him. It cannot be said that the visit by the officers on May 23 was merely for the purpose of requesting defendant to reconsider his earlier decision to remain silent and be represented by counsel. They were there in the course of continued importunity and coercive interrogation in the guise of a request for reconsideration. Moreover, the warnings which police gave to defendant were inadequate, for they failed to advise him that he was entitled to have his attorney present during the time when the police were questioning the defendant and that he was entitled to stop talking at any time in the course of making a statement (*People* v. *Dunnett*, 44 A D 2d 733).

For a waiver to be effective, it must be established that there was " an intentional relinquishment or abandonment of a known right or privilege " (*Johnson* v. *Zerbst*, 304 U. S. 458, 464). A confession, made after 2½ days of confinement during which time defendant, unaided by the police or the District Attorney who knew that he wanted an attorney, was totally unsuccessful in his attempts to obtain counsel and after being confronted with statements made against him by his codefendants, cannot reasonably be said to have been given freely and intentionally. If the rights to remain silent and to be represented by counsel are to have any significance, then the type of continued importunity and coercive interrogation present in this case cannot be countenanced. We conclude, therefore, that the court erred in denying defendant's motion to suppress the oral and written statements made while he was in police custody.

For the reasons above stated the judgment should be reversed, the order denying defendant's motion to suppress his oral and written statements to the police should be reversed and the motion granted, and the matter should be remitted to Oswego County Court for further proceedings upon the indictment. In view of this disposition, the prayer for a new hearing on the application to withdraw the pleas of guilty is academic.

MARSH, P. J., MOULE, CARDAMONE and SIMONS, JJ., concur.

Judgment unanimously reversed on the law and facts, order denying motion to suppress defendant's statements reversed and motion granted, and matter remitted to Oswego County Court for further proceedings on the indictment.